06-0341-pr
Mora v. People of the State of N.Y.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2006

(Argued: April 9, 2007                                      Decided: April 24, 2008
                                                           Errata filed: May 12, 2008)

Docket No. 06-0341-pr

RICARDO A. DE LOS SANTOS MORA,

        *Plaintiff-Appellant*,

        v.

THE PEOPLE OF THE STATE OF NEW YORK, RICHARD A. BROWN, District Att., FLUSHING QUEENS
POLICE DEPT.,

        *Defendants-Appellees.*

Before: LEVAL, CABRANES, and RAGGI, *Circuit Judges.*

Plaintiff, a foreign national who alleges that defendants violated Article 36 of the Vienna

Convention on Consular Relations ("Vienna Convention") by failing to notify him that he could

contact his consulate after having been arrested, appeals from a judgment of the United States District

Court for the Eastern District of New York (Raymond J. Dearie, *Judge*) dismissing his complaint, which

sought $1 million in damages under the Alien Tort Statute ("ATS"). Pursuant to 28 U.S.C. § 1915A,

which governs complaints filed by prisoners in civil actions, the District Court *sua sponte* determined

that plaintiff failed to state a claim upon which relief can be granted because Article 36 does not confer

individual rights that can be enforced in domestic courts. On appeal, plaintiff argues that the

requirement of Article 36 that States-parties inform an alien of the availability of consular notification

and access creates individual rights that can be vindicated by an action for damages not only through

the ATS, but also through 42 U.S.C. § 1983 and an implied private right of action provided for by the

1

Vienna Convention itself. We conclude, however, that a State-party's failure to fulfill its obligation to inform a detained alien of the prospect of consular notification and access, pursuant to Article 36, cannot form the basis for such a suit under the ATS, § 1983, or directly under the Vienna Convention.

Affirmed.

MICHAEL DOVER, JAE LEE[1] (Irena Nikolic, Jon Romberg, *on the brief*), Seton Hall University School of Law, Center for Social Justice, Newark, NJ, *for Plaintiff-Appellant.*

ALAN BECKOFF, Assistant Corporation Counsel (Michael A. Cardozo, Corporation Counsel of the City of New York, Leonard Koerner, Assistant Corporation Counsel, *on the brief*), New York City Law Department, New York, NY, *for Defendants-Appellees.*

SHARON SWINGLE, Attorney, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC (James H. Thessin, Acting Legal Adviser, United States Department of State, Washington, DC; Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, DC; Roslynn R. Mauskopf, United States Attorney, United States Attorney's Office for the Eastern District of New York, Brooklyn, NY; Douglas N. Letter, Attorney, Robert M. Loeb, Attorney, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, *on the brief*), *for Amicus the United States in Support of Defendants-Appellees.*

JOSÉ A. CABRANES, *Circuit Judge*:

This appeal concerns obligations imposed by Article 36 of the Vienna Convention on Consular Relations ("the Vienna Convention" or "the Convention"), Apr. 24, 1963, [1970] 21 U.S.T. 77, 100-101, T.I.A.S. No. 6820. When a national of one country is detained by authorities in another country, paragraph 1 of Article 36 imposes several requirements. Paragraph 1(b) contains three obligations: (1) "the authorities must notify the consular officers of the detainee's home country if the detainee so requests"; (2) any communication to the consular officials by a detained alien "shall also be forwarded by the said authorities without delay"; and (3) the detaining authorities "shall inform the person

_____

[1]Law students appearing pursuant to Local Rule 46(e).

2

concerned without delay of his rights under this sub-paragraph." 21 U.S.T. at 101-02. Under paragraph 1(c), consular officials of the state of the detained alien "shall have the right to visit." We consider here the third of the paragraph 1(b) requirements—the obligation of States-parties to inform a detained alien of the availability of consular notification and access.[2]

For three decades after the ratification of the Convention by the United States in 1963, it appears that no claim was asserted that the Convention generally, or Article 36(1)(b)(third) in particular, conferred rights upon individuals that could be enforced in our domestic courts, as distinguished from the customary claims of treaty violations asserted by and between States-parties in their international relations. Understandably, a passing suggestion by the Supreme Court in *Breard v. Greene*, 523 U.S. 371, 376 (1998) (per curiam), that the Convention "arguably confers on an individual the right to consular assistance following arrest," triggered an outpouring of conflicting case law on various permutations of the broad question of whether the Convention confers upon individuals *any* rights that can be enforced in our courts. The particular settings in which this broad question has arisen are many, and some are set forth in the margin.[3] We consider here only the narrow question of whether a detained alien may vindicate in an action for damages the failure of the detaining authority to inform him of the availability

---

[2] In *Sanchez-Llamas v. Oregon*, 548 U.S. 331, —, 126 S. Ct. 2669, 2675 (2006), the Supreme Court referred to two requirements imposed by Article 36(1)(b) by eliding the first and second sentences of Article 36. Because the three sentences of Article 36(1)(b) impose three distinct sets of obligations, we will refer to them as Art. 36(1)(b)(first) (the detaining authority's obligation to notify the detainee's consulate if the detainee so requests), Art. 36(1)(b)(second) (any communication to the consular officers by the detainee shall be forwarded by authorities without delay), and Art. 36(1)(b)(third)(the detaining authority's obligation to inform a detainee of the availability of consular notification and access).

[3] Other courts have considered violations of Article 36 in a variety of contexts. *See, e.g.*, *Medellín v. Texas*, 552 U.S.—, 128 S. Ct. 1346 (2008) (enforcement in state courts of the judgment of the International Court of Justice concerning Article 36 violations); *Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006) (suppression of evidence, in *habeas corpus* proceeding); *Cornejo v. County of San Diego*, 504 F.3d 853 (9th Cir. 2007) (claim for damages); *Jogi v. Voges*, 480 F.3d 822, 835 (7th Cir. 2007) (on petition for rehearing) (claim for damages); *United States v. Emuegbunam*, 268 F.3d 377, 388-94 (6th Cir. 2001) (dismissal of indictment and reversal of conviction); *United States v. Jimenez-Nava*, 243 F.3d 192, 198 (5th Cir. 2001) (suppression of statement); *United States v. Santos*, 235 F.3d 1105, 1106-08 (8th Cir. 2000) (suppression of confession and reversal of conviction); *United States v. Li*, 206 F.3d 56 (1st Cir. 2000) (en banc) (suppression of confession and dismissal of indictment). Our own court has considered an ineffective assistance of counsel claim based on counsel's failure to move to dismiss an indictment on the basis of violations of Article 36. *United States v. De La Pava*, 268 F.3d 157, 163-66 (2d Cir. 2001).

of consular notification and access.[4] For the reasons set forth below, we conclude that no such action can be maintained.

Similar questions have arisen both in the context of civil suits for damages by foreign nationals, such as the case presented here, and in the context of criminal trials and postconviction proceedings involving foreign nationals, *see* note 3 *ante.* The Supreme Court has thus far avoided answering those questions, *see Medellín v. Texas*, 552 U.S. —, — n.4, 128 S. Ct. 1346, 1357 n.4 (2008) (assuming, without deciding, that Article 36 creates judicially enforceable individual rights); *Sanchez-Llamas v. Oregon*, 548 U.S. 331, —, 126 S. Ct. 2669, 2677-78 (2006) (same), although four Justices have expressed the view that these questions should be answered in the affirmative, *see id.* at 2693-98 (Breyer, J., dissenting, joined by Stevens, Souter, & Ginsburg, JJ.). Our sister Courts of Appeals are split. *Compare Cornejo v. County of San Diego*, 504 F.3d 853, 859-64 (9th Cir. 2007) (concluding that Article 36's obligation to inform aliens of their right to consular notification does not create judicially enforceable individual rights), *United States v. Emuegbunam*, 268 F.3d 377, 391-94 (6th Cir. 2001) (same), *and United States v. Jimenez-Nava*, 243 F.3d 192, 196-98 (5th Cir. 2001) (same), *with Jogi v. Voges*, 480 F.3d 822, 834-35 (7th Cir. 2007) (concluding that Article 36 creates individual rights to be informed of consular notification and access that can be vindicated in a private action). And in cases where the majority did not reach the question, non-majority opinions reflect similarly divergent conclusions. *Compare United States v.*

---

[4] We hasten to note some of the questions that we need not, and do not, reach in order to decide the narrow question presented by this lawsuit. First of all, we have no occasion here to consider, much less resolve, the general and difficult question of whether there are any other circumstances in which courts could entertain an individual right of action under the Convention. We do not consider whether a detaining authority's refusal to comply with the first set of requirements of Article 36(1)(b)—by refusing to notify the consulate at the request of the detained alien—would present such circumstances, *see* Art. 36(1)(b)(first). We do not consider whether at the insistence of a detained alien a court may order such a recalcitrant detaining authority to notify the consulate of his detention or to send a communication from a detained alien to his consulate, *see* Art. 36(1)(b)(first)-(second); or direct a recalcitrant detaining authority to permit a consular official to visit a detained alien or otherwise allow the consular official to communicate with the detained alien, *see id.*; or order notification of obligations owed when a detained alien, who knows that obligations are owed but does not know exactly what they are, asks to be informed with specificity, *see* Art. 36(1)(b)(third). And finally, we do not consider whether a detaining authority that gives automatic notification to the consular post of arrested aliens (before asking for the consent of the detained alien) presents a case in which courts could entertain an individual action for violations of the Convention. In identifying questions that we have not considered here, we underscore that we intimate no view on the merits of such questions.

*Santos*, 235 F.3d 1105, 1109 (8th Cir. 2000) (Beam, J., concurring) (concluding that Article 36 does not create a judicially enforceable individual right to be informed of a right to consular notification upon arrest), *and United States v. Li*, 206 F.3d 56, 66-68 (1st Cir. 2000) (en banc) (Selya & Boudin, JJ., concurring) (same), *with Li*, 206 F.3d at 68-76 (Torruella, J., concurring in part and dissenting in part) (concluding that Article 36 creates a judicially enforceable individual right to be advised about the prospect of consular assistance). Our Court has yet to speak definitively on the question. In *United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001), an appeal from a criminal conviction, we considered whether it was necessary to vacate a conviction where the defendant argued that he had received ineffective assistance of counsel because his lawyer had not moved to dismiss the indictment on the basis of an alleged violation of Article 36(1)(b)(third), *id.* at 163. We determined that a violation of Article 36's obligation to inform aliens of the prospect of consular notification and access does not provide a basis for the dismissal of an indictment, and therefore it is not ineffective assistance of counsel for a lawyer not to request dismissal on this basis. *See id.* at 165-66.

We are thus required to consider the thoughtful, if conflicting, arguments of some of our colleagues elsewhere in the federal courts. For the reasons stated below, and in keeping with the apparent practices of the other States-parties to the Convention,[5] we conclude that Article 36's obligation to inform detained aliens of the prospect of consular notification and access cannot, when violated, be vindicated by a private action for damages filed in our courts. We find that the text of the

---

[5] We requested that *amicus* the United States provide us with information regarding the judicial enforcement of alleged individual rights in the domestic courts of other States-parties to the Convention. The United States has informed us that in January 2007, the U.S. Department of State surveyed U.S. embassies worldwide, asking "can an individual sue in court if he or she did not receive consular notification and/or access?" *Amicus*'s May 11, 2007 Supp. Letter Br. 2. The State Department received 96 responses, representing 91 of the 170 countries party to the Convention. "With one possible exception," the State Department was unable to identify any country in which an individual litigant could sue for money damages for violation of the consular notification and access provisions in Article 36. *Id.* And "with a handful of possible exceptions," no other country's courts "have construed the consular notification requirements of the Convention to create privately enforceable individual rights." *Id.* Moreover, although the governments of 36 countries, acting as *amici* in a companion case to *Sanchez-Llamas*, expressed the view that Article 36 creates judicially enforceable individual rights to be informed of the prospect of consular notification and access, they did not identify any statutory authority or administrative or judicial proceedings in their own countries affording individuals the rights they assert are available to detained aliens in the courts of the United States. *Id.* at 2 n.3.

Vienna Convention and its context make clear that Article 36(1)(b)(third) does not afford detained aliens with individual rights that they can assert through such litigation. Interpretive principles, such as the presumption that treaties do not create privately enforceable rights in the absence of express language to the contrary, counsel against such an interpretation here. *See Medellín*, 552 U.S. at — n.3, 128 S. Ct. at 1357 n.3 (collecting cases in the court of appeals acknowledging such a presumption). Pursuant to the instructions of the Supreme Court with respect to the deference owed to the views of the Executive on issues of treaty interpretation, we accord "great weight," *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184 (1982), to the settled view of the Executive under successive national administrations. *See Li,* 206 F.3d at 63 (noting in 2000, during the Clinton Administration, the view of the Executive that the Vienna Convention does not create individual rights); *id.* at 63-64 (charting the views of the Executive since 1970); *see also Amicus's* Br. 5; note 28 *post.* Finally, the views of the International Court of Justice ("ICJ") on this issue do not persuade us otherwise. We further conclude that plaintiff's claims for violation of Article 36(1)(b)(third) do not give rise to a cause of action under the Alien Tort Statute.

The judgment of the United States District Court for the Eastern District of New York (Raymond J. Dearie, *Judge*), which dismissed plaintiff-appellant's complaint pursuant to 28 U.S.C. § 1915A[6] for failure to state a claim upon which relief can be granted, is therefore affirmed.

## BACKGROUND

A.  The Vienna Convention

The Vienna Convention is the product of the United Nations Conference on Consular

---

[6] Section 1915A states that a district court "shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). The court "shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . fails to state a claim upon which relief may be granted." *Id.* § 1915A(b). At all times relevant to the procedural history of the instant case, plaintiff was (and continues to be) an inmate in the custody of the Federal Bureau of Prisons as the result of a more recent conviction than the one involved in the instant case.

Relations ("the Conference"), which met in the capital of Austria in March and April of 1963. Working from a draft prepared by the International Law Commission,[7] representatives from the governments of 92 countries, including the United States, came together to draft the final document. *See generally* Luke T. Lee, *Vienna Convention on Consular Relations* 15-18 (1966). One commentator has noted that, "[a]s the first conference of this kind participated in by states from all parts of the world, it had to strive toward as broad an area of agreement as possible, acceptable to states old and new, whatever their political and economic systems." *Id.* at 16. The President of the United States, upon the advice and consent of the Senate, ratified the Convention in 1969. 21 U.S.T. at 77. As of 2006, 170 countries were party to the Convention. *Sanchez-Llamas*, 126 S. Ct. at 2674.

The Vienna Convention consists of a preamble and 79 articles. Article 36, which "concerns consular officers' access to their nationals detained by authorities in a foreign country," *id.* at 2675, states in full:

> 1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
>
> (a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;
>
> (b) *if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner.* Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph*;
>
> (c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have

---

[7] The International Law Commission, which is "charged with the task of codifying and developing international law," was established by the General Assembly of the United Nations in 1947. *See generally* 1 *Oppenheim's International Law* 103-10 (Sir Robert Jennings & Sir Arthur Watts eds., 9th ed. 1996).

the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

21 U.S.T. at 101-02 (emphasis added). Paragraph 2 of Article 36 is said to "provide[ ] guidance regarding how these requirements, and the other requirements of Article 36, are to be implemented." *Sanchez-Llamas*, 126 S. Ct. at 2675.

In addition to the Convention itself, the President, upon the consent of the Senate, ratified the Optional Protocol Concerning the Compulsory Settlement of Disputes ("the Optional Protocol" or "Protocol"), Apr. 24, 1963, [1970] 21 U.S.T. 325, T.I.A.S. No. 6820. The Protocol states that (1) the ICJ has "compulsory jurisdiction" over "[d]isputes arising out of the interpretation or application of the Convention"[8] and (2) accordingly, any State-party to the Protocol may bring such a dispute before the

---

[8] As we explained in *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 250 n.24 (2d Cir. 2003):

The International Court of Justice ("ICJ") is a multinational body charged with discerning and applying international law. Under the Charter of the United Nations, "[a]ll Members of the United Nations [including the United States] are *ipso facto* parties to the Statute of the International Court of Justice." Charter of the United Nations, 59 Stat. 1033, 1051, T.S. No. 993 (1945), Art. 93 (effective Oct. 24, 1945).

The United States Senate consented to the Charter of the United Nations on July 28, 1945, 91 Cong. Rec. 8185, 8190 (1945), causing the United States to be a party to the Statute of the ICJ. The Senate famously conditioned its adoption of President Truman's Declaration that the United [S]tates would accede to the compulsory jurisdiction of the ICJ with the Connally Reservation, which permits the United States to opt out of the jurisdiction of the ICJ over a particular dispute if [it] determines that the dispute is domestic in nature and that its domestic jurisdiction applies. *See* Acceptance of Compulsory Jurisdiction of the International Court of Justice, 92 Cong. Rec. 10,694-97 (1946); Dep't State Bull., Sept. 1946, at 452-53.

ICJ. *Id.* at 326. The United States withdrew from the Protocol in 2005.[9] *Sanchez-Llamas*, 126 S. Ct. at 2675.

B. Facts and Procedural History of the Instant Case

The following facts are taken from the *pro se* complaint filed in the District Court by plaintiff-appellant Ricardo A. De Los Santos Mora ("plaintiff"). We accept these facts as true for the purposes of this appeal and draw all inferences in plaintiff's favor. *See, e.g.*, *McInerney v. Rensselaer Polytechnic Inst.*, 505 F.3d 135, 138 (2d Cir. 2007).

Plaintiff is a currently incarcerated native and citizen of the Dominican Republic who entered the United States in 1991. In 1992, he was arrested in Queens, New York, and charged with attempted robbery in violation of New York State law. According to plaintiff's allegations, he did not speak English at the time of his arrest, and the arresting officers did not speak Spanish. He was interrogated without an interpreter present, although he told police in Spanish that he did not understand and wanted to speak with somebody in Spanish. After appearing before a judge, plaintiff was appointed counsel who did not speak Spanish. Plaintiff was then, according to his allegations, "coerced into taking a plea without the benefit of an interpreter." He was sentenced to six months' incarceration and five years' probation. The arresting officers and the prosecutor knew that plaintiff was a citizen of the Dominican Republic but never advised him that he could request legal assistance from the Dominican consulate.

On December 5, 2005, plaintiff, who is represented by counsel on appeal, filed a *pro se* complaint under the Alien Tort Statute ("ATS").[10] Plaintiff's complaint alleges that defendants-

---

[9] The international legal consequences of a State-party's unilateral withdrawal from a treaty that has no explicit withdrawal provision, such as the Optional Protocol, is a complicated and unsettled question. *See generally*, W. Michael Reisman & Mahnoush H. Arsanjani, *No Exit? A Preliminary Examination of the Legal Consequences of the United States' Notification of Withdrawal from the Optional Protocol to the Vienna Convention on Consular Relations, in Promoting Justice, Human Rights and Conflict Resolution Through International Law* 897 (Marcelo G. Kohen ed., 2007). We need not address it here.

[10] The ATS, sometimes referred to as the Alien Tort Claims Act, provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

appellees Queens County District Attorney and New York City Police Department (jointly, "defendants")[11] violated Article 36 of the Vienna Convention by failing to inform him that he could contact the Dominican consulate. It also claims that "[t]he outcome of Plaintiff['s] case would have been different if [he] would [have] known of his Vienna Convention rights," and that "serious error by the arresting officers and District Attorney caused [*sic*] [him] his freedom." As relief, plaintiff requested $1 million.[12] Shortly after filing his complaint, plaintiff requested permission to proceed *in forma pauperis.*

In a memorandum and order entered on December 30, 2005, the District Court granted plaintiff's request to proceed *in forma pauperis.* However, the District Court *sua sponte* dismissed plaintiff's complaint for failure to state a claim upon which relief can be granted pursuant to 28 U.S.C. § 1915A, concluding that "[t]he Vienna Convention was meant to protect the rights of states to care for their nationals traveling abroad, not to protect the rights of individuals."[13] Final judgment was also entered on December 30, 2005. Plaintiff timely appealed. On appeal, plaintiff, now represented by

---

[11] Plaintiff referred to the New York City Police Department as "Flushing Queens Police Department" in his complaint.

[12] Plaintiff has filed similar complaints in other federal courts. In November 2005, he brought suit in the United States District Court for the Eastern District of Virginia, alleging violations of the Vienna Convention in connection with a 1997 conviction for drug trafficking. The District Court in that case concluded that a judgment in plaintiff's favor would necessarily imply the invalidity of his conviction; it therefore dismissed the complaint pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994) (holding that plaintiff's conviction must first be declared invalid before plaintiff can proceed with a claim for damages based on the unlawful conviction). *See De Los Santos-Mora v. Bradenham*, 194 F. App'x 100, 101 (4th Cir. 2006). The Fourth Circuit vacated the District Court's judgment on the basis that plaintiff's suit was not "*Heck*-barred" because Article 36 "does not implicate any right to consular intervention or cessation of the criminal investigation and . . . violation of any rights under Article 36 would not trigger application of the exclusionary rule." *Id.* In January 2006, plaintiff brought suit in the United States District Court for the District of Delaware, alleging violations of the Vienna Convention in connection with a 1995 arrest and 1996 acquittal on drug trafficking charges. The District Court in that case declined to address whether Article 36 creates individual rights. Rather, it dismissed plaintiff's complaint for failure to state a claim upon which relief can be granted, observing that plaintiff could not show either "causation or damages" because (1) Article 36 does not guarantee any consular assistance, (2) plaintiff enjoyed the protections of the Due Process Clause, and (3) plaintiff was found "not guilty" by a jury. *See De Los Santos Mora v. Brady*, No. 06-46-JJF, 2007 WL 981605, at *4 (D. Del. Mar. 30, 2007). Because we conclude that Article 36 does not confer upon plaintiff an individual right that he can enforce in the instant case, we take no view on whether his suit would be barred under *Heck* or whether he would be able to pursue claims for nominal damages in the event he cannot show a causal connection between his New York conviction and the alleged violations of Article 36.

[13] The District Court also commented that a violation of the Vienna Convention does not support dismissing an indictment or vacating a sentence, conclusions that we need not address in our consideration of the availability of a claim for money damages.

counsel, argues that Article 36 confers upon him individual rights that he may enforce, not only under the ATS, but also under 42 U.S.C. § 1983[14] and pursuant to an implied private right of action created by the Vienna Convention itself.

## DISCUSSION

This appeal requires us to consider whether an alien may bring an action seeking damages for the alleged violation of Article 36(1)(b)(third)—that is, the obligation of States-parties to inform a detained alien of the availability of consular notification and access—directly under the Vienna Convention or pursuant to § 1983 or the ATS. We conclude that Article 36(1)(b)(third) does not provide for rights that can be vindicated through such litigation.

In the *Head Money Cases*, 112 U.S. 580 (1884), the Supreme Court summarized the basic relationship between treaties and individual rights. "A treaty," the Court explained, "is primarily a compact between independent nations." *Id.* at 598. As such, "[i]t depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it." *Id.* Treaty violations, therefore, are "the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress." *Id.* "[W]ith all this the judicial courts have nothing to do and can give no redress." *Id.* However, "a treaty may also contain provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal [*i.e.*, domestic] law, and which are capable of enforcement as between private parties in the courts of the country." *Id.* The Supremacy Clause of the United States

---

[14] In relevant part, 42 U.S.C. § 1983 provides that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

11

Constitution, U.S. Const. art. VI, cl. 2,[15] "places such provisions . . . in the same category as other laws of [C]ongress." *Head Money Cases*, 112 U.S. at 598. Thus, "[a] treaty, then, is a law of the land as an act of [C]ongress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined." *Id.* at 598-599. "And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would a statute." *Id.* at 599.

Whether a treaty creates a right in an individual litigant that can be enforced in domestic proceedings by that litigant is for the court to decide as a matter of treaty interpretation. *See Garza v. Lappin*, 253 F.3d 918, 924 (7th Cir. 2001) ("Whether a particular international agreement provides for private enforcement is a matter for judicial interpretation of the agreement."); Restatement (Third) of the Foreign Relations Law of the United States ("Restatement (Third)") § 907 cmt. a (1987) ("Whether an international agreement provides a right or requires that a remedy be made available to a private person is a matter of interpretation of the agreement.").[16] It is our task in the instant case to determine

_____

[15] The Supremacy Clause provides in full:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

[16] This inquiry is distinct from whether a treaty is "self-executing." Restatement (Third) § 111 cmt. h. "[N]ot all international law obligations automatically constitute binding federal law enforceable in United States courts." *Medellín*, 552 U.S. at — , 128 S. Ct. at 1355. "Self-executing treaties do not require implementing legislation and become effective as domestic law immediately upon entry into force. Non-self-executing treaties do not become effective as domestic law until implementing legislation is enacted." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 161 n.21 (2d Cir. 2007); *see also Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829) (Marshall, C.J.) ("Our constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision. But when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can become a rule for the Court."), *overruled in part on other grounds*, *United States v. Percheman*, 32 U.S. (7 Pet.) 51 (1833). In other words, "[t]he label 'self-executing' usually is applied to any treaty that according to its terms takes effect upon ratification and requires no separate implementing statute. Whether the terms of such a treaty provide for private rights, enforceable in domestic courts, is a wholly separate question." *United States v. Li*, 206 F.3d 56, 67 (1st Cir. 2000) (en banc) (Selya & Boudin, JJ., concurring) (citation omitted).

The Supreme Court has declined to resolve whether the Vienna Convention is self-executing. *See Medellín*, 552 U.S. at — n.4, 128 S. Ct. at 1357 n.4. The parties have not raised this question, and we need not decide it here.

whether the requirement that a detaining authority inform an alien of the prospect of consular notification and access set forth in Article 36(1)(b)(third) of the Vienna Convention crosses the boundary between possible benefits to individuals secured by States and State officials and rights conferred directly upon individuals that are assertable, in a private action brought directly under the Convention itself or pursuant to § 1983 or the ATS, by the individuals themselves in our courts of law.

A.  An Alien Cannot Vindicate in an Action for Damages a Violation of Article 36's Obligation to Inform Aliens of the Prospect of Consular Notification and Access.

1.  Text and Context

"[T]he main task of any tribunal which is asked to apply or construe or interpret a treaty" is to "give[ ] effect to the expressed intention of the parties, that is, their intention *as expressed in the words used by them in the light of the surrounding circumstances*."  Lord McNair, *The Law of Treaties* 365 (1961).  It is thus a well-established principle that a court interpreting a treaty "begin[s] with the text of the treaty and the context in which the written words are used."  *United States v. Cuevas*, 496 F.3d 256, 263 (2d Cir. 2007) (quoting *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 534 (1987)) (internal quotation marks omitted).

The text of Article 36 certainly requires that the authorities of a "receiving State" (that is, the detaining State) take certain actions with respect to the nationals of a "sending State" (that is, the detainee's home State).  For example, paragraph 1(b) of Article 36 provides that if a detained individual of foreign citizenship so requests, the detaining authorities must alert the individual's home consulate of the detention, *see* Art. 36(1)(b)(first); moreover, the authorities must inform the detained individual that he can contact his home consulate, *see* Art. 36(1)(b)(third).  21 U.S.T. at 101.  And at least some of these requirements are explicitly referred to as "rights" of the individual foreign nationals.  Paragraph 1(b) instructs the detaining authorities to inform the foreign national "without delay of his rights under this sub-paragraph," Art. 36(1)(b)(third), and paragraph 2 contains instructions for the implementation of the "rights referred to in paragraph 1."  21 U.S.T. at 101.

13

It is notable, however, that the critical requirement at issue in the instant case—a receiving State's obligation to inform a detained foreign national of his "rights" under paragraph 1(b)—is never itself expressly referred to as a "right." Moreover, the text of the Convention is entirely silent as to whether private individuals can seek redress for violations of this obligation—or any other obligation set forth in Article 36—in the domestic courts of States-parties. Of course, whether an individual right exists and how that right may be enforced by the individual are different questions. Nevertheless, we think that the lack of *any* mention in the text of Article 36(1)(b) as to whether or how detained foreign nationals might vindicate their asserted rights at least suggests that the drafters of the Convention did not intend to confer rights directly upon individuals. *Cf.* page 25-26 *post* (noting treaties that expressly provide for individual judicial remedies).[17] The language of Article 36 is set forth in a document that "is *primarily* a compact between independent nations," although it "*may* also contain provisions which confer certain rights upon" individuals, *Head Money Cases*, 112 U.S. at 598 (emphasis added). But "[n]othing in [the treaty's] text explicitly provides for judicial enforcement of [its] consular access provisions at the behest of private litigants," *Li*, 206 F.3d at 66 (Selya & Boudin, JJ., concurring), or, for that matter, creates a right to be informed of the prospect of consular access and notification that can be privately vindicated directly under the Vienna Convention or pursuant to § 1983.

Moreover, we have observed that the vocabulary of "individual rights" may be used to refer to certain potential benefits provided by treaty that do not actually create rights enforceable by the individuals benefitted. *See United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 67 (2d Cir. 1975). As Judges Selya and Boudin explained in their concurring opinion in *Li*:

> Of course, there are references in the [Convention] to a "right" of access, but these references are easily explainable. The contracting States are granting each other rights, and telling future detainees that they have a

---

[17] Indeed, the Vienna Convention elsewhere provides for remedies for violations of specific Articles, albeit remedies of States rather than of individuals. *See* Vienna Convention, Art. 23(2), 21 U.S.T. at 92 (providing a remedy to receiving States for a sending State's failure to recall a consular official deemed a *persona non grata*); Art. 31, 21 U.S.T. at 97 (providing for compensation to a State upon the expropriation of consular premises by the receiving State).

14

"right" to communicate with their consul is a means of implementing the treaty obligations *as between States*.

*Li*, 206 F.3d at 66 (Selya & Boudin, JJ., concurring) (emphasis in original). Indeed, even with respect to statutes, the Supreme Court has on several occasions rejected the argument that references to the "rights" of persons potentially benefitted by legislation (appearing both in text and legislative history) necessarily support the view that the legislation creates rights in individuals that can be enforced by those individuals through mechanisms such as a § 1983 action or an implied private right of action. *See, e.g., Gonzaga Univ. v. Doe*, 536 U.S. 273, 289 n.7 (2002); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 18-20 (1981). Similarly, the isolated language of Article 36(1)(b) is at most ambiguous as to the existence of rights that can be privately vindicated in court in the manner sought by plaintiff. Thus, in accordance with the Fifth and Sixth Circuits, as well as Judges Selya and Boudin of the First Circuit, we conclude that the requirement that an alien be informed of consular notification and access in Article 36(1)(b)(third), even taken in conjunction with the several references to "rights," does not establish a right in the alien that can be vindicated in a damages action for failure to inform the alien of the obligation. *See Emuegbunam*, 268 F.3d at 391-94; *Jimenez-Nava*, 243 F.3d at 196-98; *Li*, 206 F.3d at 66-68 (Selya & Boudin, JJ., concurring).

Several additional textual and contextual considerations militate against construing Article 36's obligation to inform an alien of the prospect of consular notification and access as creating individual rights that, when violated, can be vindicated through private litigation brought directly under the Convention or pursuant to § 1983. For example, the first clause of paragraph 1 of Article 36 begins with the following statement of purpose: "[w]ith a view to facilitating the exercise of consular functions relating to nationals of the sending State." 21 U.S.T. at 100. Plaintiff argues that individual enforcement of the Vienna Convention may aid sending States in the exercise of their consular functions. However, the introductory language of Article 36 emphasizes the exercise of these functions, rather than an individual's ability to benefit from these functions—giving rise to ambiguity as

15

to whether the provisions that follow create entirely independent individual rights that may be vindicated by lawsuits in our courts.

The Preamble to the Convention also favors defendants' position.[18] It bears underscoring that a preamble is not without meaning under international law. It provides valuable context for understanding the terms of a treaty. *See* Vienna Convention on the Law of Treaties, art. 31(2), *opened for signature* May 23, 1969, 1155 U.N.T.S. 331, 340 (providing that "[t]he context for . . . purpose[s] of . . . interpret[ing] . . . a treaty shall comprise . . . the text, *including its preamble* and annexes," as well as other related agreements (emphasis added)).[19]

The parties focus on the language in paragraph five of the Preamble stating that "the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance

---

[18] The Preamble to the Vienna Convention on Consular Relations reads in full:

*The States Parties to the present Convention*,

*Recalling* that consular relations have been established between peoples since ancient times,

*Having in mind* the Purposes and Principles of the Charter of the United Nations concerning the sovereign equality of States, the maintenance of international peace and security, and the promotion of friendly relations among nations,

*Considering* that the United Nations Conference on Diplomatic Intercourse and Immunities adopted the Vienna Convention on Diplomatic Relations which was opened for signature on 18 April 1961,

*Believing* that an international convention on consular relations, privileges and immunities would also contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems,

*Realizing* that the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States,

*Affirming* that the rules of customary international law continue to govern matters not expressly regulated by the provisions of the present Convention,

*Have agreed* as follows . . . .

21 U.S.T. at 79 (footnotes omitted).

[19] Although the United States has not ratified the Vienna Convention on the Law of Treaties, our Court relies upon it "as an authoritative guide to the customary international law of treaties," insofar as it reflects actual state practices. *See Avero Belgium Ins. v. American Airlines, Inc.*, 423 F.3d 73, 79 & n.8 (2d Cir. 2005). The Department of State considers the Vienna Convention on the Law of Treaties an authoritative guide to current treaty law and practice. *Id.* at 79 n.8.

16

of functions by consular posts on behalf of their respective States." Defendants and *amicus* the United States argue that this language is evidence that the Convention is not meant to confer rights on individuals. Defs.' Br. 7; *Amicus*'s Br. 7-8. Plaintiff, pointing out that the preceding clause in paragraph four of the Preamble specifies that the "privileges and immunities" mentioned are "consular," argues that paragraph 5's language "has no bearing on the existence of rights assertedly granted to *private* individuals by specific articles of the treaties, but rather refers to benefits attaching to consular or diplomatic officers as a result of their status as officials representatives of a foreign State." Pl.'s Supp. Reply Br. 2. In other words, according to plaintiff, the Preamble "merely set[s] forth the long-standing principle that the intent of granting privileges and immunities *to official representatives of foreign States* is not to benefit those individuals personally, but rather to further the amicable relations between the receiving State and the sending State . . . ." *Id.* at 3 (emphasis added).

Even if the Preamble cannot be read as explicitly or categorically rejecting the creation of rights in private individuals, it certainly reflects the broader principle that the Convention is concerned primarily, if not exclusively, with establishing relationships and rights as between States and State officials.[20] By referring only to "consular relations, privileges and immunities," the Preamble suggests that any relations, privileges, or immunities the Convention creates are strictly those of consular officials.[21] Moreover, the Preamble declares that the overarching aim of the Convention is to

---

[20] Indeed, this seems to have been the understanding of the United States at the time that the Vienna Convention was ratified. The report prepared by the Senate Committee on Foreign Relations (the "Committee") recommending that the Senate give its advice and consent to ratification of the Convention and Protocol understood Articles 28 to 57 to be about "[c]onsular facilities, privileges and immunities of consular officers and other members of a consular post." S. Exec. Rep. No. 91-9 at 2 (1969). This understanding was based in part on testimony from the Deputy Legal Adviser for Administration that "the particular virtue of this Convention lies in its establishment of a basic standard of treatment for *consular posts and their personnel* throughout the world . . . ." *Id.* at 8 (emphasis added); *see also id.* at 6 ("[T]he Convention . . . goes very far toward clarifying the obligations of states concerning the treatment to be accorded foreign consular posts and their personnel. Because of its definite rules and procedures, the Convention should reduce the possibility of misunderstanding between governments in this area of their relations.").

[21] To the extent plaintiff's argument suggests that, as a general matter, the Convention treats "rights" differently from "privileges and immunities," we disagree. If the consular "privileges and immunities" referred to in the Preamble are distinct from any consular "rights" referred to later in the Convention, then those consular "rights" would not be subject to the preambular limitation on providing benefits to individuals, rather than to consular officers in their official capacity. Plaintiff's view has been explicitly rejected by the Supreme Court. *See Breard*, 523 U.S. at 378 ("Any rights that

17

"contribute to the development of friendly relations *among nations*." 21 U.S.T at 79 (emphasis added). The motivating principles of the Convention as stated in the Preamble are clearly principles governing the relations of States *inter se*—concern for the "sovereign equality of States, the maintenance of international peace and security, and the promotion of friendly relations among nations." *Id.* These passages suggest that the rights created by the Convention similarly belong to, and should generally be enforced by, the States-parties to the Convention and their official representatives.

The Optional Protocol likewise reinforces the view that Article 36(1)(b)(third) does not create rights in an individual that can be vindicated through an action for damages. Although expressly designed to implement the terms of the Convention, it makes no mention of private actions by detained individuals. Rather, Article I of the Protocol provides that "[d]isputes arising out of the interpretation or application of the Convention shall lie within the compulsory jurisdiction of the [ICJ] and may accordingly be brought before the [ICJ] by an application made by any [State-]party to the dispute being a Party to the present Protocol." 21 U.S.T. at 326.

The lack of individual rights that can be vindicated through a private action for damages does not deprive Article 36 of force for at least four reasons. First, states-parties can safeguard the rights in the Convention (and protect their nationals) through "negotiations and reclamations." *See Head Money Cases*, 112 U.S. at 598. Second, the reciprocal nature of the Vienna Convention provides receiving states with a natural incentive to comply with its terms.[22] For instance, the United States, in an action

---

the Consul General might have by virtue of the Vienna Convention exist for the benefit of Paraguay, not for him as an individual.").

[22] The United States, in a brief signed by the Department of State and the Department of Justice, informs us that federal authorities in the United States have undertaken extensive efforts to raise awareness of, and secure adherence to, the terms of the Convention at all governmental levels, notwithstanding the lack of any successful civil suits by individuals seeking to enforce Article 36. We note several examples of these efforts here: Beginning in 1970, the State Department sent letters to the governors of all 50 states, "advising them that the Convention had entered into force and reviewing its requirements." *Amicus*'s May 11, 2007 Supp. Letter Br. 6. In addition, "State Department officials attended conferences of law enforcement officials, . . . published articles in law enforcement magazines[,] . . . and conducted periodic mass mailing to major U.S. cities" in an effort to publicize the requirements of Article 36. *Id.* Since 1998, State Department personnel have conducted approximately 454 training events on Article 36 throughout the United States and its territories. *Id.* at 3 (citing http://travel.state.gov/law/consular/consular_3139.html). In 1998, the State Department published and widely circulated a manual entitled *Consular Notification and Access: Instructions for Federal,*

brought by the federal government, can sue state and local governments to ensure compliance. *See Amicus*'s May 11, 2007 Supp. Letter Br. at 10 ("[T]he federal government is empowered to require that state or local law enforcement officials who detain foreign nationals do so in accordance with the substantive restrictions set out in the Convention."); *see also* Brief for United States, as *Amicus Curiae* Supporting Respondents at 15, *Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669 (2006), 2006 WL 271823, at *15 ("Under longstanding principles, the United States could bring an action in court to enforce compliance with a treaty obligation.") (citing *Sanitary Dist. v. United States*, 266 U.S. 405, 425-26 (1925) (Holmes, J.)). Third, the lack of any privately enforceable right to damages for a violation of Article 36(1)(b)(third) may not foreclose the possibility that a domestic court, having established that an arrested alien is a foreign national, might inquire whether he has been informed that he may contact his

---

*State, and Local Law Enforcement Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials To Assist Them*. *Id.* at 4. The Department has also made efforts to incorporate the requirements of Article 36 into the training curricula and accreditation standards of law enforcement agencies. *Id.* at 4. Furthermore, in its representations to the ICJ, the United States stated that the federal judiciary has been "enlisted" directly to help with Treaty compliance, and further that the "United States affirmatively encourages judicial authorities to ensure that consular notification requirements have been complied with, and some states have placed the obligation of providing or confirming consular information on their magistrates." Declaration of Ambassador Maura A. Harty, Annex 4 to Counter-Memorial of the United States at A11, ¶ 28, *Case Concerning Avena and other Mexican Nationals* (Mex. v. U.S.), 2004 I.C.J. No. 128 (Oct. 25, 2003); Counter-Memorial of the United States at 110, *Case Concerning Avena and other Mexican Nationals* (Mex. v. U.S.), 2004 I.C.J. No. 128 (Nov. 3, 2003). In addition, regulations govern compliance with Article 36 on the part of federal law enforcement officials. *Id.* at 9 (citing 28 C.F.R. § 50.5 (Department of Justice); 8 C.F.R. § 236.1(e) (Department of Homeland Security); and 28 C.F.R. § 540.45(b) (Bureau of Prisons)). Some states too have passed laws enacting the substance of Article 36. *See, e.g.*, Cal. Penal Code § 834c(a)(1) ("In accordance with federal law and the provisions of this section, every peace officer, upon arrest and booking or detention for more than two hours of a known or suspected foreign national, shall advise the foreign national that he or she has a right to communicate with an official from the consulate of his or her country . . .").

The United States also informs us that many of its compliance efforts have been directed toward New York City. The State Department has distributed hundreds of pocket reference cards and training videos to state and local law enforcement entities in the City, and has provided training sessions and briefings for law enforcement officials on a number of occasions. *Id.* at 7-8.

With respect to the policies and practices of New York City law enforcement authorities themselves, defendants and the United States have informed us that the New York City Police Department's Patrol Guide sets forth procedure No. 208-56, which governs the processing of the arrests of foreign nationals and requires that certain consulates be notified if one of their nationals is arrested and that nationals from other countries be informed that they may contact their consulates. The New York City Department of Corrections maintains a similar procedure for foreign nationals in custody. These basic requirements are not significantly different from those in place when defendant was arrested in 1992. Defs.' Apr. 18, 2007 Letter 2; *Amicus*'s May 11, 2007 Supp. Letter Br. 8. The NYPD's Police Student's Guide explains these requirements, and the City holds seminars for law enforcement officials on the Convention's consular notification provisions. *Amicus*'s May 11, 2007 Supp. Letter Br. 8 (citing http://www.nyc.gov/html/unccp/html/consular/special_events.shtml).

consulate and fulfill the obligation to inform him.  Fourth, a detained alien may be able to petition

officials of a detaining authority, including where appropriate the courts, to comply with the obligations

set forth in Article 36.  These mechanisms might not always result in outcomes fully satisfactory to the

offended State, but failure to secure optimal compliance or relief does not deprive a treaty provision of

meaning any more than, for example, a judgment for nominal damages makes a statute meaningless.

We also reject the argument that plaintiff's inability to recover damages for the alleged violation

of Article 36(1)(b)(third) is incompatible with paragraph 2 of Article 36, which requires that the laws

and regulations of States-parties "enable full effect to be given to the purposes for which the rights

accorded under this Article are intended."  21 U.S.T. at 102.  In *Sanchez-Llamas*, the Supreme Court,

assuming *arguendo* the existence of individual rights under Article 36, considered the claim that applying

procedural default rules to such rights would deny Article 36 "full effect."[23]  The Court explained its

rejection of this claim as follows:

> Sanchez-Llamas argues that the language of the Convention implicitly

---

[23]  In *Sanchez-Llamas*, the Court "assum[ed], without deciding," that Article 36 created a judicially-enforceable right to consular notification and access but concluded that an exclusionary remedy was inappropriate for violation of rights conferred by the Vienna Convention. 548 U.S. at — , 126 S. Ct. at 2677-78; *see also Medellín*, 552 U.S. at — n.4, 128 S. Ct. at 1357 n.4 (same).  This approach—to "assume without deciding" that the relevant provision of Article 36 creates privately enforceable individual rights—arguably could apply to plaintiff's claim for damages pursuant to an implied private right of action under the treaty.  Such an approach, however, is inappropriate where the plaintiff claims a damages remedy pursuant to § 1983 and would rest on a fundamental misunderstanding of the relationship between treaty law and §1983.  *See also Jogi*, 480 F.3d at 831-32 (noting the distinction "between a private right, on the one hand, and various remedial measures that affect criminal prosecutions, on the other").

Because we hold that Article 36(1)(b)(third) does not create rights that can be vindicated in a damages action brought directly under the Convention or pursuant to § 1983, we disagree that plaintiff can state a claim for a private right of action created by the Convention.  Nonetheless, we note that assuming *arguendo* that plaintiff has an individual right under the Convention, his claim for damages pursuant to § 1983 would likely be actionable.  *See Gonzaga*, 536 U.S. at 284 ("[B]ecause § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes[,] [o]nce a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983.") (citation omitted).  Section 1983 would likely provide a cause of action for damages in the case of a treaty violation in the same manner that § 1983 provides a cause of action for remedying a statutory violation. *See, e.g.*, *Cornejo*, 504 F.3d at 858 ("[A]n unambiguously conferred right phrased in terms of the person benefitted is essential before a statute—and by extension, a treaty having the force of federal law—may support a cause of action under § 1983.") (internal quotation marks omitted).

Accordingly, a conclusion that *the treaty* does not provide a right to damages ignores the fact that it is § 1983 that allows for damages and not the treaty.  Notably, in *Sanchez-Llamas*, the remedy sought was based on the treaty itself, such as suppression of evidence or dismissal of an indictment.  Accordingly, the Court found that the treaty did not grant such a remedy and avoided the question of whether the treaty created an individual right. 548 U.S. at —, 126 S. Ct. at 2677-78.

20

requires a judicial remedy because it states that the laws and regulations governing the exercise of Article 36 rights "must enable *full effect* to be given to the purposes for which the rights . . . are intended," Art. 36(2), 21 U.S.T., at 101 (emphasis added). In his view, although "full effect" may not automatically require an exclusionary rule, it does require an appropriate judicial remedy of *some* kind. There is reason to doubt this interpretation. In particular, there is little indication that other parties to the Convention have interpreted Article 36 to require a judicial remedy in the context of criminal prosecutions. . . . Of course, diplomatic avenues—the primary means of enforcing the Convention—also remain open.

*Sanchez-Llamas*, 126 S.Ct. at 2680-82 (emphasis in orginal). For similar reasons, we do not regard the Convention's "full effect" provision as *requiring* a damages claim for a failure to inform an alien of the consular access and notification requirements. In addition to the remedies normally available to States-parties to a treaty, courts may themselves take actions to comply with the Convention that, in effect, correct violations of the treaty by law enforcement authorities. A court's compliance with Article 36, perhaps in response to a request by our national government for treaty compliance addressed to the thousands of law enforcement authorities in our federal system, *see* note 22 *ante*, is not the same as individual enforcement of alleged Article 36 rights in a private civil lawsuit for damages; this independent responsibility or ability on the part of a court to abide by the Convention has nothing to do with the existence *vel non* of rights enforceable in a private action by an individual.[24] We reject any suggestion by plaintiff that Article 36 is rendered meaningless in the absence of a cause of action for damages by individual foreign nationals to vindicate an alleged violation of its notification provisions.

2. The Presumption Against Conferral of Individual Rights by International Treaties Requires a Clear Statement of the Treaty Drafters' Intent

---

[24] Our holding does not render Article 36's guarantees empty nor does it conflict with *Sanchez-Llamas*, 126 S. Ct. at 2682 ("If [a foreign national] raises an Article 36 violation at trial, a court can make appropriate accommodations to ensure that the defendant secures, to the extent possible, the benefits of consular assistance."). The court would not actually be remedying a treaty violation or allowing enforcement of an individual right, as it would if it applied the exclusionary rule, or dismissed an indictment, or allowed a civil suit to proceed; rather, it would simply be complying with the terms of the treaty. Thus, even in the absence of individual rights enforceable by an alien in a civil proceeding, a court might—possibly in response to requests for cooperation by our national government, which itself acts under a treaty obligation assumed by that government in its international relations—inquire as to whether a defendant knows that he may contact his consulate; it might even order that the prosecuting authority allow a foreign national to contact his consulate.

21

"Even when treaties are self-executing . . . the background presumption is that international agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts." *Medellín*, 552 U.S. at — n.3, 128 S. Ct. at 1357 n.3 (citation and quotation marks omitted). We have recognized that international treaties establish rights and obligations between States-parties—and generally not between states and individuals, notwithstanding the fact that individuals may benefit because of a treaty's existence. This is so because a treaty is an agreement between states forged in the diplomatic realm and similarly reliant on diplomacy (or coercion) for enforcement. *Medellín*, 552 U.S. at —, 128 S. Ct. at 1357. As the Supreme Court explained in the *Head Money Cases*,

> A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it. If these fail, its infraction becomes the subject of international negotiations and reclamations, so far as the injured party chooses to seek redress, which may in the end be enforced by actual war.

112 U.S. at 598. The mechanisms for establishing and enforcing international treaties—namely, the nation's powers over foreign affairs—have been delegated by the Constitution to the Executive and Legislative branches of government. *See Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918) ("[T]he conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments."). Accordingly, a due respect for the Constitution's separation of powers, and a recognition of our own weak tools in this area, require the courts to refrain from venturing heedlessly into the realm of foreign affairs. *See Head Money Cases*, 112 U.S. at 598 ("It is obvious that with all this [*i.e.*, treaty negotiation and enforcement] the judicial courts have nothing to do and can give no redress."). Indeed, the Supreme Court has specifically instructed courts to exercise "great caution" when considering private remedies for international law violations because of the risk of "impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727-28 (2004). For these reasons, when interpreting treaties, we generally look for a clear statement of the intent of treaty drafters.

22

Our cautious approach to recognizing private rights within treaty provisions obtains even when international treaties appear to confer benefits on individuals. Over a quarter of a century ago, we explained that "even where a treaty provides certain benefits for nationals of a particular state—such as fishing rights—it is traditionally held that 'any rights arising out of such provisions are, under international law, those of the states and . . . individual rights are only derivative through the states.'" *Gengler*, 510 F.2d at 67 (quoting Restatement (Second) of the Foreign Relations Law of the United States ("Restatement (Second)") § 115 cmt. e (1965)); *see also* Restatement (Third) § 907 cmt. a ("International agreements, *even those directly benefiting private persons*, generally do not create private rights or provide for a private cause of action in domestic courts, but there are exceptions with respect to both rights and remedies." (emphasis added)).

The presumption that "treaties do not create privately enforceable rights in the absence of express language to the contrary" is reflected in the case law of our own Circuit and that of our sister circuits. *See Medellín,* 552 U.S. at — n.3, 128 S. Ct. at 1357 n.3.[25] Our precedents recognize a presumption against inferring individual rights from treaties. *See, e.g., United States v. Rommy,* 506 F.3d

[25] As the Supreme Court has noted, other courts of appeals have recognized this presumption that treaties generally "do not create privately enforceable rights in the absence of express language to the contrary." *Medellín*, 552 U.S. at –- n. 3, 128 S. Ct. at 1357 n.3. At least nine of the other courts of appeals have applied such a presumption. *See United States v. Li*, 206 F.3d 56, 60 (1st Cir. 2000) (en banc) ("[T]reaties do not generally create rights that are privately enforceable in the federal courts."); *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1298 (3d Cir. 1979) ("Like private rights under law, a treaty may confer rights capable of enforcement, but this is not the general rule." (citations omitted)); *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992) ("International treaties are not presumed to create rights that are privately enforceable."); *United States v. Jimenez-Nava*, 243 F.3d 192, 195 (5th Cir. 2001) ("[Treaties] do not generally create rights that are enforceable in the courts."); *United States v. Emuegbunam*, 268 F.3d 377, 389 (6th Cir. 2001) ("As a general rule . . . international treaties do not create rights that are privately enforceable in the federal courts."); *Jogi v. Voges*, 480 F.3d 822, 834 (7th Cir. 2007) ("Although international treaties as a rule do not create individual rights, *Sosa* recognizes that international law in general, and thus treaties in particular, occasionally do so."(citation omitted)); *Cornejo v. County of San Diego,* 504 F.3d 853, 859 (9th Cir. 2007) ("Whether or not aptly characterized as a 'presumption,' the general rule is that [i]nternational agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts, but there are exceptions with respect to both rights and remedies."(international quotation marks and citations omitted)); *Canadian Transport Co. v. United States*, 663 F.2d 1081, 1092 (D.C. Cir. 1980) ("[A] treaty must be interpreted in accord with the rule that treaty violations are normally to be redressed outside the courtroom."); *see also Dry v. United States*, 235 F.3d 1249, 1256 (10th Cir. 2000) ("It is well-settled that [t]he very great majority of Indian treaties create tribal, not individual, rights." (internal quotation marks and citations omitted)); *Ligon v. Johnston*, 164 F. 670, 672 (8th Cir. 1908) ("Until specific, private, individual rights attach pursuant to law, the enforcement of such trusts [as created by treaty] must be at the bar of public conscience. They are not justiciable in the courts."). It should be noted that courts of appeals have occasionally conflated the question of whether a treaty is self-executing with whether the same treaty creates individual rights. *See, e.g., Mannington Mills*, 595 F.2d at 1298.

108, 129-30 (2d Cir. 2007) (applying presumption to a bilateral mutual legal assistance treaty between the United States and the Netherlands); *United States v. Davis*, 767 F.2d 1025, 1030 (2d Cir. 1985) (applying presumption to United States-Switzerland bilateral mutual legal assistance treaty); *Dreyfus v. Von Finck,* 534 F.2d 24, 29-30 (2d Cir. 1976) (applying presumption to Hague Convention, the Kellogg-Briand Pact, the Versailles Treaty, and the Four Power Occupation Agreement); *Gengler*, 510 F.2d at 67 (2d Cir. 1975) (applying presumption to United Nations Charter and the Charter of the Organization of American States).

If contracting States-parties wish to impose upon themselves legal obligations that extend not only to each other, but to all individual foreign nationals, we would ordinarily expect expression of these obligations to be unambiguous. Whether we call this expectation a "presumption," or refer to it as some other rule of construction,[26] or simply treat it as a general guide to treaty interpretation, the result is the same. *See, e.g., Medellín*, 552 U.S. at —, 128 S. Ct. at 1357 n.3 (adopting a clear-statement rule for determining when treaties are self-executing); *Breard*, 523 U.S. at 375 (1998) ("[I]t has been recognized in international law that, absent a clear and express statement to the contrary, the procedural rules of the forum State govern the implementation of the treaty in that State."); *Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 135 (1989) ("We are to find out the intention of the parties by just rules of interpretation applied to the subject matter; and having found that, our duty is to follow it as far as it goes, and to stop where that stops—whatever may be the imperfections or difficulties which it leaves behind.").[27]

---

[26] *Amicus* United States argues that the inquiry as to whether a treaty, as federal law, creates private rights should be guided by principles, such as the *Gonzaga* "clear-statement rule," governing whether a statute creates individual rights. *See, e.g., Gonzaga University v. Doe*, 536 U.S. 273, 290 (2002)("[I]f Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms—no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action."). We note that the two other courts of appeals to address the question of whether a violation of Article 36(1)(b)(third) is remediable in private action pursuant to § 1983 have applied the *Gonzaga* clear-statement rule in this context. *Cornejo*, 504 F.3d at 858-60 (concluding that presumption was not overcome); *Jogi*, 480 F.3d at 827-28 (finding the presumption overcome).

[27] This presumption comports with the approach offered by Justice Breyer in his dissent in *Medellín:* where a treaty creates "specific, detailed individual legal rights . . . that judges can readily enforce," it is likely directly enforceable, but where enforcement of a treaty would require the creation of a new cause of action, "it is not likely that the provision

24

We do not, of course, require "robotic incantations" or "talismanic invocations" by treaty drafters in order to create individual rights, any more than we do of Congress, district judges, or administrative agencies in a variety of spheres. *See, e.g.*, *Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 336 n.17 (2d Cir. 2006) (reviewing an immigration judge's credibility finding); *United States v. Fernandez*, 443 F.3d 19, 30 (2d Cir. 2006) (reviewing a district court's consideration of the sentencing set out in 18 U.S.C. § 3553(a)); *Riegel Textile Corp. v. Celanese Corp.*, 649 F.2d 894, 900 (2d Cir. 1981) (considering whether Congress created a statutory private right of action). Indeed, the Supreme Court, on several occasions, has permitted foreign nationals to enforce provisions of treaties that did not explicitly provide for judicial enforcement of their guarantees. *Cf. Kolovrat v. Oregon*, 366 U.S. 187, 190-91 & n.6 (1961) (allowing foreign nationals to challenge a state law limiting their inheritance rights under a treaty providing that "[i]n all that concerns the right of acquiring, possessing or disposing of every kind of property . . . citizens of [each country who reside in the other] shall enjoy the rights which the respective laws grant . . . in each of these states to the subjects of the most favored nation"); *United States v. Rauscher*, 119 U.S. 407, 410-11 (1886) (allowing a criminal defendant to raise in his defense certain alleged violations of an extradition treaty). However, these cases represent circumstances in which the general presumption was overcome because it was far clearer that the intent of the treaty drafters was to confer rights that could be vindicated in the manner sought by the affected individuals. *See also Jimenez-Nava*, 243 F.3d at 197.

In sum, there are a number of ways in which the drafters of the Vienna Convention, had they intended to provide for an individual right to be informed about consular access and notification that is enforceable through a damages action, could have signaled their intentions to do so. *Cf.* Treaty of Friendship, Commerce and Consular Rights, U.S.-Ger., art. I, Dec. 8, 1923, 44 Stat. 2132, 2133 (expressly providing that "[t]he nationals of each High Contracting Party shall enjoy freedom of access

---

contemplates direct judicial enforcement." 552 U.S. at —, 128 S. Ct. at 1382 (Breyer, J., dissenting).

25

to the courts of justice of the other on conforming to the local laws, as well for the prosecution as for the defense of their rights"); Treaty of Commerce and Navigation, U.S.-Japan, art. VII, Feb. 21, 1911, 37 Stat. 1504, 1506 (expressly authorizing companies in the contracting parties' territory "to exercise their rights and appear in the courts either as plaintiffs or defendants, subject to the laws of such other [p]arty"); *see also Clark v. Allen*, 331 U.S. 503 (1947) (entertaining an individual suit brought under the Treaty of Friendship, Commerce and Consular Rights between the United States and Germany*)*; *Asakura v. City of Seattle*, 265 U.S. 332 (1924) (allowing a foreign national to challenge a city ordinance on the basis that it violated the US-Japan Treaty of Commerce and Navigation). That they chose not to signal any such intent counsels against our recognizing an individual right that can be vindicated here in a damages action.

3. The Views of the United States Are Entitled to Substantial Deference

The views of *amicus* the United States constitute another "very powerful reason" for concluding that private individuals do not have rights that can be vindicated in a damages suit for failure to be informed about consular notification and access. *Li*, 206 F.3d at 67 (Selya & Boudin, JJ., concurring). We place "great weight" on the interpretation of a treaty by the Executive of our federal government. *See Medellín*, 552 U.S. at —, 128 S. Ct. at 1349; *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."). In the instant case, two federal agencies—the Department of State and the Department of Justice—have jointly submitted an *amicus* brief to our Court on behalf of the United States in support of defendants' position regarding the existence *vel non* of individual rights that can be vindicated privately in courts. *Cf. id.* at 184-85 & n.10 (stating that the interpretation of a treaty set forth in an *amicus* brief by the Department of State was entitled to "great weight"). Plaintiff argues that the deference we owe the position of the United States is diminished here because the United States has previously argued, before an international tribunal, that Article 36 creates judicially enforceable individual rights. In particular,

plaintiff directs us to the official pleading of the United States in *Case Concerning U.S. Diplomatic &*
*Consular Staff in Tehran* (U.S. v. Iran), 1980 I.C.J. 3 (May 24). We disagree that this pleading reflects an
inconsistency from the view to which it has "unfailingly adhered" that the Vienna Convention "does
not create domestically enforceable federal law" of the sort that would support plaintiff claims, *Medellín*,
552 U.S. at —, 128 S. Ct. at 1361; nor does this persuade us to give less than "great weight" to the
views expressed in the *amicus* brief.

Plaintiff emphasizes that in its pleading to the ICJ in the 1980 litigation involving Iran's taking
of American diplomatic and consular staff as hostages, the United States argued that "Article 36
establishes rights not only for the consular officer but, perhaps even more importantly, for the
nationals of the sending State who are assured access to consular officers and through them to others."
Memorial of the Government of the United States of America, *Case Concerning U.S. Diplomatic &*
*Consular Staff in Tehran* (U.S. v. Iran), 1982 I.C.J. Pleadings 121, 174 (Jan. 12, 1980). This statement,
however, must be understood in context. The opening sentence of the section containing the
statement reads as follows:

> Pursuant to Article 36 of the Vienna Convention on Consular Relations,
> the Government of Iran is *under an international legal obligation to the United States to*
> *ensure* that United States consular officers shall be free to communicate with
> nationals of the sending State and to have access to them, *that United States*
> *nationals in Iran have the same freedom with respect to communication with an access to*
> *consular officers of the sending State*, and that United States consular officers have the
> right to visit United States nationals who are in prison, custody, or detention.

*Id.* at 173 (emphasis added) (internal quotation marks omitted). This sentence makes clear that
whatever derivative protections Article 36 might provide to individuals—even if these protections may
be referred to as "rights"—the legal obligations arising thereunder are owed to the United States, not to
the individuals themselves. *Cf. Gonzaga*, 536 U.S. at 289 n.7 (rejecting the argument that "any reference
to 'rights,' even as a shorthand means of describing standards and procedures imposed . . . should give
rise to a statute's enforceability under § 1983"). Thus, it is manifestly the case that, in its pleading to
the ICJ, the United States was *not* suggesting that the American hostages taken by Iran ought to have

27

access to the courts of Iran in order to vindicate their individual rights under the Convention.
Accordingly, we do not find the pleading to be inconsistent with the current views of the United
States,[28] to which we must continue to accord great weight.[29]

> 4. The Views of the ICJ Do Not Persuade Us that Article 36 Confers an Individual Right that Can Be Vindicated in a Damages Action, Either Directly Under the Convention or Pursuant to § 1983.

Plaintiff draws to our attention two opinions of the ICJ that, he claims, addressed the existence
of individual rights under Article 36 of the Vienna Convention that can be privately vindicated in
courts. *See Case Concerning Avena and Other Mexican Nationals* (Mex. v. U.S.), 2004 I.C.J. 12 (Mar. 21);
*LaGrand Case* (F.R.G. v. U.S.), 2001 I.C.J. 466 (June 27). In those cases, the ICJ made certain
comments regarding the "rights" of individuals under Article 36 while considering whether "the Vienna
Convention . . . preclude[s] the application of procedural default rules to Article 36 claims" raised in
American *habeas corpus* proceedings. *Sanchez-Llamas*, 126 S. Ct. at 2683. In contrast to the "great

---

[28] As the First Circuit's majority opinion in *Li* reveals, the views of the United States to which we defer in the instant case are by no means confined to the administration of President George W. Bush. Writing in February 2000, and discussing the position of the State Department under President William J. Clinton, the First Circuit stated that "[i]n the State Department's view, the [Convention] [does] not create individual rights at all . . . ." *Li*, 206 F.3d at 63. Quoting from a series of answers provided by the State Department in response to questions by the First Circuit, the *Li* Court explained:

> [T]he State Department has concluded that "[t]he [Vienna Convention] and the US-China bilateral consular convention are treaties that establish state-to-state rights and obligations. . . . They are not treaties establishing rights of individuals. The right of an individual to communicate with his consular official is derivative of the sending state's right to extend consular protection to its nationals when consular relations exist between the states concerned."

*Id.* (omission and second and third alterations in original). Quoting further from the State Department answers, the First Circuit related that it was the State Department's position that "[t]he [only] remedies for failures of consular notification under the [Vienna Convention] are diplomatic, political, or exist between states under international law." *Id.* (second and third alterations in original) (internal quotation marks omitted).

[29] In any event, isolated past inconsistencies do not diminish the deference that courts owe clearly espoused views of the Executive in the realm of treaty interpretation. *See, e.g.*, *Sumitomo Shoji Am., Inc.*, 457 U.S. at 184 n.10 (explaining that the State Department's current interpretation of a treaty was still entitled to "great weight" notwithstanding a prior letter by a State Department Deputy Legal Adviser that took a contrary view); *cf. INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (noting, when declining to give deference to an agency's interpretation of a statute, the agency's "long pattern of erratic treatment of the issue"). And even where an extensive series of prior positions might justify decreased deference, at a minimum those positions, when compared with the current position, must reflect plain inconsistency on the part of the Government. *Cf. id.* (describing "three different ways" in which an agency interpreted the statute at issue). We find no such inconsistency here.

weight" we must provide the views of our Executive, the Supreme Court has instructed that we "should give respectful consideration to the interpretation of an international treaty rendered by an international court with jurisdiction to interpret such." *Breard*, 523 U.S. at 375. We are not bound either to give that interpretation any particular weight when considering the text and context of a treaty, or to treat it as having any dispositive effect in the event of ambiguity. Accordingly, the "respectful consideration" owed to the interpretation of an international court is similar to our treatment of, *inter alia*, agency opinion letters and enforcement manuals under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See Christensen v Harris County*, 529 U.S. 576, 587 (2000). That is, the interpretation of the international court is "entitled to respect . . . but only to the extent that [it has] the power to persuade." *Id.* (citations and internal quotation marks omitted). "The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140.[30]

We do not find the views of the ICJ expressed in *Avena* and *LaGrand* to be persuasive in the instant case. In *Avena*, the ICJ merely asserted that "the individual rights. . . under paragraph 1(b) of Article 36 of the Vienna Convention are rights which are to be asserted, at any rate in the first place, within the domestic legal system of the United States." *Avena*, 2004 I.C.J. at 35. No further rationale was given for regarding Article 36 as conferring rights upon private individuals that they can enforce in domestic courts. The ICJ then observed that "Article 36, paragraph 1 [of the Vienna Convention], creates individual rights [for the national concerned], which . . . may be invoked in this Court *by the national State of the detained person*." *Id.* at 36 (alterations and omission in original) (emphasis added) (quoting *LaGrand*, 2001 IC.J. at 494) (internal quotation marks omitted). This conclusion—that Article

---

[30] The treatment of ICJ decisions described above is consistent with the treatment of ICJ judgments by the Supreme Court, *see Medellín*, 552 U.S. at —, 128 S. Ct. at 1359 ("ICJ judgments were not meant to be enforceable in domestic courts."), as well as the role of ICJ judgments mandated by Article 59 of the Statute of the International Court of Justice, which provides that a "decision of the [ICJ] has no binding force except between the parties and in respect of that particular case," June 26, 1945, 59 Stat. 1051, 1062, T.S. No. 993. *See generally Flores*, 414 F.3d at 250-52 & n.25.

29

36 creates "individual rights" that can be asserted *by a sending State in the ICJ*—is not inconsistent with the view that Article 36 creates potential benefits for individuals but that an individual does not have a right that can be vindicated in a damages action for such a violation. And even if the import of this statement were that Article 36 confers enforceable rights directly upon individuals, we do not think that the ICJ's brief analysis in *LaGrand* leading to such a determination casts doubt upon our conclusions above. After listing the basic requirements of Article 36, the ICJ noted that Article 36 uses the term "rights" and allows a detained foreign national to refuse assistance from the sending State. *See LaGrand*, 2001 I.C.J. at 494. The ICJ then stated that "[t]he clarity of these provisions, viewed in their context, admits of no doubt." *Id.* Yet a proclamation of certainty is not a substitute for persuasiveness. We do not believe that the relevant provision at issue here indicates an intention, much less a clear one, to confer rights directly upon individuals that can be vindicated in a damages action for failure to inform them of the obligation of consular notification and access.

### 5. The Convention's *Travaux Préparatoires* Do Not Require a Different Result

The Supreme Court has observed that it has "traditionally considered as [an] aid[ ] to [a treaty's] interpretation the [treaty's] negotiating and drafting history (*travaux préparatoires*)." *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996); *see also Société Nationale Industrielle Aérospatiale*, 482 U.S. at 534 ("The treaty's history, the negotiations, and the practical construction adopted by the parties *may* [in addition to text and context] be relevant." (emphasis added) (internal quotation marks omitted)). The terms in which the Supreme Court has described the interpretive effect of the negotiating and drafting history of a treaty, the *travaux préparatoires*, suggest a usefulness that is conditional and secondary to the text and context of the treaty. As Article 32 of the Vienna Convention on the Law of Treaties, *see* note 19 *ante* and accompanying text, explains further, recourse to the *travaux* "may be had" only to (1) "confirm the meaning resulting from" the consideration of text and context or (2) "determine the meaning when the interpretation according to [text and context] (a) [l]eaves the meaning ambiguous or obscure[ ] or (b) [l]eads to a result which is manifestly absurd or unreasonable." 1155 U.N.T.S. at 340.

30

Whether the *travaux* support plaintiff's stance is by no means clear. Plaintiff directs us to several discussions of "individual rights" during debates over proposed amendments to the Convention. *See, e.g.*, 1 *Official Records*, United Nations Conference on Consular Relations 332 (1963) (statement of the Spanish delegate, asserting that "[t]he right of the nationals of a sending State to communicate with and have access to the consulate and consular officials of their own countries . . . was one of the most sacred rights of foreign residents in a country"). Yet, as is the case with references to "rights" in the legislative history of statutes, *see Pennhurst*, 451 U.S. at 18-20, such terminology does not usefully distinguish between (1) legal obligations owed directly to individuals and enforceable by them under municipal (*i.e.*, domestic) law, and (2) legal obligations that might inhere to the benefit of individuals but are owed to a representative entity. The plaintiff has also not directed us to any passage in which the Conference considered whether these "rights" could be vindicated in an action for damages, nor have we located such a passage. In any event, scattered examples drawn from the *travaux* to support plaintiff's position would not defeat the deference ("great weight") we owe to the clear and consistent views of the United States.

B.  Plaintiff's Claims Cannot Support a Cause of Action Pursuant to the ATS

Apart from his claims based on an implied right of action under the Vienna Convention and § 1983, plaintiff claims that this alleged violation of Article 36(1)(b)(third) gives rise to a claim pursuant to the ATS for a violation of customary international law. The novel tort proposed, a form of unlawful detention, does not meet the Supreme Court's requirements for recognition of a customary international law tort.[31] We conclude that plaintiff has not shown that his detention without being

---

[31]A violation of Article 36(1)(b)(third) by itself would not meet the specificity requirement for recognition of an ATS cause of action. In *Sosa*, the Court concluded that a general prohibition of "arbitrary detention," even where such a norm was prescribed in an international agreement, was too broad to achieve the status of a binding customary norm actionable under the ATS. 542 U.S. at 736; *id.* at 738 ("Whatever may be said for the broad principle Alvarez advances, in the present, imperfect world, it expresses an aspiration that exceeds any binding customary rule having the specificity we require. Creating a private cause of action to further that aspiration would go beyond any residual common law discretion we think it appropriate to exercise."). Rather, defining the plaintiff's claim at the requisite level of specificity, the Court concluded that plaintiff's tort claim on the basis of "a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so

31

informed of the availability of consular notification and access amounts to a tort in violation of customary international law cognizable under the ATS, 28 U.S.C. § 1350.

In *Sosa v. Alvarez-Machain*, the Supreme Court acknowledged that the ATS is a jurisdictional statute but that it also grants courts the power recognize "private causes of action for certain torts in violation of the law of nations," 542 U.S. 692, 724 (2004). The Court cautioned against recognition of actionable international norms and observed that only a "modest number" of customary international law torts are cognizable under the ATS. *Id.* Among the many reasons counseling restraint, the Court emphasized that the "collateral consequences of making international rules privately actionable argue for judicial caution." *Id.* at 725. To provide a cause of action under the ATS, a customary international law tort must meet a "high bar" for recognizing new causes of action: it must be both specific and well-accepted. *Id.* We conclude that plaintiffs' ATS claim fails the second criterion.

To form the basis of a ATS suit, the alleged tort must be "defined with a specificity comparable to the features of the 18th-century paradigms" of torts in violation of the law of nations—violations of safe conducts, offenses against ambassadors, and piracy. *Sosa,* 542 U.S. at 725; *id.* at 715 (quoting 4 W. Blackstone, *Commentaries on the Laws of England* 68 (1769)). These paradigmatic examples involve offenses "principally incident to whole states or nations and not individuals seeking relief in court." *Id.* at 720 (citations and internal quotation marks omitted). Plaintiff has pointed to no sources which evince support for the specific customary international law tort proposed here—detention without being informed of the availability of consular notification and access. *Cf. Vietnam Ass'n*, 517 F.3d at 119-23 (concluding that plaintiffs had failed to describe a relevant norm of customary international law with the requisite specificity). To the contrary, it appears that none of the States-parties to the Convention, "[w]ith one possible exception," recognize such a tort in their domestic law. *See* note 5

well defined as to support the creation of a federal remedy." *Id.*; *see also Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*, 517 F.3d 104, 119 (2d Cir. 2008) (concluding that plaintiffs had not provided "support [for] a universally-accepted norm prohibiting the wartime use of Agent Orange that is defined with the degree of specificity required by *Sosa*").

*ante.* Thus, it cannot be said that the tort proposed has "attained the status of a binding customary norm," *Sosa*, 542 U.S. at 737; *see also Flores,* 414 F.3d at 248 ("[C]ustomary international law is composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern."). Nor can it be said that imprisonment in violation of Article 36(1)(b)(third) is "so bad that those [who engage in this conduct] become enemies of the human race." *Sosa*, 542 U.S. at 737.

We also note that this inquiry "involve[s] an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id.* at 732-33. This consideration weighs against recognition of plaintiff's proposed cause of action. A customary international law tort for imprisonment in violation of Article 36(1)(b)(third) suffers from the same infirmities as the tort proposed in *Sosa*: "the label [enemy of the human race] would never fit the reckless policeman who botches his [notice of the availability of consular notification and access], even though that same officer might pay damages [for violating any applicable] municipal law." *Sosa*, 542 U.S. at 737. Accordingly, we cannot recognize an ATS cause of action for the alleged violations of Article 36(1)(b)(third).

## CONCLUSION

For the reasons stated above, we conclude that the obligation of detaining authorities to inform an alien of the consular notification and access requirements set forth in Article 36(1)(b)(third) of the Vienna Convention does not authorize an individual to vindicate in an action for damages a violation of Article 36(1)(b)(third) pursuant to § 1983, ATS, or directly under the Convention. Accordingly, the judgment of the District Court is **AFFIRMED**.

33