09-1575-cv
Katel Limited v. AT&T Corp.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2009

(Argued: February 4, 2010        Decided: May 27, 2010)

Docket No. 09-1575-cv

- - - - - - - - - - - - - - - - - - - -x

KATEL LIMITED LIABILITY COMPANY,

                Plaintiff-Appellant,

        - v.-

AT&T CORPORATION,

                Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - -x

        Before:        JACOBS, Chief Judge, POOLER and KATZMANN, Circuit Judges.

        KATEL Limited Liability Company appeals from a judgment entered by the United States District Court for the Southern District of New York (Holwell, J.), dismissing by summary judgment its claims against AT&T Corporation, which allege breach of contract and tortious interference with contractual relations, and seek relief under the International Telecommunications Regulations.  We affirm.

DAVID J. EDWARDS (Paul J. Yesawich, III, James P. Nonkes, on the brief), Harris Beach PLLC, Pittsford, New York, for Appellant.

SUZANNE L. MONTGOMERY, AT&T Services, Inc., Bedminster, New Jersey; Henry Guy Burnett, Sarah E. O'Connell (on the brief), Fulbright & Jaworski L.L.P., New York, New York, for Appellee.

DENNIS JACOBS, Chief Judge:

In 1993 or 1994 (the date is disputed), AT&T Corporation ("AT&T") entered into an International Telecommunications Services Agreement ("Agreement") with KATEL Limited Liability Company ("KATEL"), an international telecommunications carrier, to govern the exchange of phone calls between AT&T in the United States and KATEL in Kyrgyzstan. The essence of the Agreement was that KATEL would build the necessary infrastructure in Kyrgyzstan, and AT&T would use that infrastructure for a fee. The parties began exchanging telecommunications traffic shortly afterward. In 1997, AT&T began sending its telecommunications traffic to Kyrgyztelecom ("KT"), a competitor of KATEL. Soon thereafter, AT&T began using an intermediary service to route its calls to Kyrgyzstan and

2

stopped paying KT; moreover, since it was no longer using KATEL's services, it was not paying KATEL, either.

KATEL bought an assignment of rights from KT, and sued AT&T in the United States District Court for the Southern District of New York (Holwell, J.) on March 28, 2002, claiming breach of contract, tortious interference with contractual relations, and an entitlement to fees pursuant to the International Telecommunications Regulations. The district court granted summary judgment to AT&T on all claims, and this appeal is taken from the judgment.

We affirm.

I

The controversy turns on the interplay between two paragraphs of the Agreement. Paragraph 7 provides, inter alia, that "as soon as KATEL and AT&T establish direct circuits, the parties will begin routing traffic between the Republic of Kyrgyzstan and the United States on these circuits, using the ['indirect'] transit routes via Russia and Turkey only when direct circuits are not capable of

carrying the offered traffic."[1]  Paragraph 19, entitled "Non-Exclusive Privileges," provides that "[n]othing in this Agreement shall be deemed to restrict or prejudice the rights of either party to enter into similar service agreements with other parties."

Transmission arrangements.  In 1993 or 1994, AT&T and KATEL entered into the Agreement and began sending telecommunications traffic to one another.  In early 1997, AT&T contracted with KT to provide international telecommunications services in Kyrgyzstan; at the same time, AT&T stopped sending traffic to KATEL (and has sent none since).  But soon thereafter AT&T stopped paying KT for its call termination services.  On October 11, 1999, representatives from AT&T, KATEL, and KT met at AT&T's New

---

[1] Traffic passes "directly" when it originates in the United States on AT&T's infrastructure and "terminates" in Kyrgyzstan on KATEL's infrastructure.  AT&T, as the "originating carrier," would then pay an agreed-upon fee to KATEL as the "terminating carrier."

Traffic passes "indirectly" when AT&T originates a call in the United States and sends it to a third-party carrier, which then sends it along to KATEL.  AT&T would pay a fee to KATEL, and AT&T and KATEL would each pay half of the fee owed to the third-party carrier.

Jersey headquarters. AT&T conceded that it owed money to KATEL or KT or both, but the parties could not resolve the muddle, and KATEL initiated this litigation.

In the meantime, AT&T continued sending direct and indirect traffic to KT until May 2002, at which point it adopted a different method of routing calls into Kyrgyzstan: "refile." Under a refile arrangement, the originating carrier (AT&T) sends the traffic to a third-party carrier, and pays it; the third-party carrier then sends the traffic into the terminating country and pays the terminating carrier. (The FCC has recognized refile as an economically rational way for an international telecommunications provider to structure its business dealings with other carriers. See In re Int'l Settlement Rates, 12 F.C.C.R. 19806, 19811-12 (Aug. 18, 1997)). Thus AT&T delivers the calls to the third party and does not deliver the calls to Kyrgyzstan directly *or* indirectly. In short, AT&T washed its hands of business in Kyrgyzstan.

Litigation. On March 28, 2002, KATEL sued AT&T in the Southern District of New York. Recognizing that KT might be a necessary party, KATEL unsuccessfully invited KT to join the litigation. To forestall any possible Rule 12(b)(7)

motion, KATEL bought an assignment of KT's rights against AT&T (through May 2002). KATEL and KT executed a six-page "Russian Language Assignment," and (on the same day) an "English Language Assignment" that was intended to replicate the Russian Language Assignment and that could be used by KATEL to defeat a Rule 12(b)(7) motion.

On September 4, 2003, KT intervened in the KATEL-AT&T lawsuit and moved to compel arbitration against KATEL pursuant to the terms of the Russian Language Assignment.[2] (KATEL contends that KT's intervention was inspired by AT&T.) AT&T then moved to file an interpleader counterclaim by which it would deposit with the district court the sum of $1,120,199.04, the amount that all parties agreed was owed to KATEL and/or KT for the period 1997 through May 2002. The court granted AT&T's motion; the parties stipulated that this was the amount owed; and the KATEL-KT litigation was stayed pending the outcome of their arbitration, which was to determine how the interpleaded funds would be divided between them. The arbitrator ultimately ruled that KATEL was entitled to the full amount, and on October 31, 2006,

---

[2] KT also brought other claims against KATEL and AT&T. Those claims are not relevant to the issues presented in this appeal.

the district court ordered that the funds be disbursed to KATEL.

Meanwhile, in the KATEL-AT&T litigation, the parties had filed cross-motions for summary judgment. At oral argument on February 9, 2006, KATEL argued that: (1) AT&T breached the Agreement by failing to adhere to Paragraph 7's requirement that it use KATEL's infrastructure to send calls to Kyrgyzstan; (2) AT&T tortiously interfered with KATEL's business relations with KT; and (3) AT&T owed reimbursement to KATEL for traffic sent by AT&T to Kyrgyzstan--even for periods when AT&T did not use KATEL's equipment or services --by virtue of the International Telecommunications Regulations ("ITRs").

In an oral decision, the district court ruled for AT&T on all claims. As to breach of contract, the court concluded that Paragraph 19 makes the Agreement a non-exclusive contract that allows AT&T to use other means to route traffic into Kyrgyzstan; that absent any such obligation to send a specific amount of traffic through Katel, AT&T did not breach the Agreement when it stopped using KATEL's circuits; and that Paragraph 7 concerns how traffic will be routed--not *whether* AT&T is required to

7

offer any traffic to KATEL.

As to tortious interference, the district court ruled that the declaration of KATEL principal Ross Jacoby (on which KATEL wholly relied) offered no more than conclusory allegations that AT&T had sought to "drive a wedge" between KATEL and KT. Separately, the court held that AT&T had a reasonable basis to believe that KT rather than KATEL was authorized to do business in Kyrgyzstan, and to act upon that belief.

As to the ITRs, the court held that they confer no private right of action.

At a status hearing two weeks after this summary judgment ruling, the district court ordered KATEL to submit in writing the nature of any remaining claims it had against AT&T. KATEL responded that its only remaining claim concerned payment it believed AT&T owed for the period January 1, 2000 through April 30, 2001. After some additional discovery, AT&T moved for summary judgment, which the district court granted on the ground that KATEL offered no evidence that AT&T owed anything other than the sum it had already lodged with the court. In addition, the district court denied a motion by KATEL to reopen discovery

for the purpose of disclosing Jacoby as an expert witness on the custom and practice of the international telecommunications industry.

This appeal. KATEL raises five arguments on appeal: (1) AT&T breached the Agreement by not using KATEL's services to terminate calls in Kyrgyzstan; (2) even if AT&T was not in breach, industry custom and practice required AT&T to pay KATEL for calls terminating in Kyrgyzstan; (3) KATEL presented sufficient evidence on its tortious interference claim; (4) the ITRs provide a private right of action; and (5) the district court abused its discretion in denying KATEL's motion to reopen discovery for the purpose of disclosing Jacoby as an expert witness.

Analyzing the arguments seriatim, we affirm.

**II**

KATEL contends that AT&T breached the Agreement by sending telecommunications traffic to Kyrgyzstan by means other than the AT&T-KATEL link referenced in Paragraph 7 of the Agreement.

Our interpretation of the Agreement is governed by New

York law.  See Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 98 (2d Cir. 2000).  Under New York contract law, "'the intent of the parties governs.'" Crane Co. v. Coltec Indus., Inc., 171 F.3d 733, 737 (2d Cir. 1999) (quoting Am. Express Bank Ltd. v. Uniroyal, Inc., 562 N.Y.S.2d 613, 614 (1st Dep't 1990)).  "[W]e ascertain this intent 'from the plain meaning of the language employed' in the agreements, rather than from extrinsic evidence." Crane, 171 F.3d at 737 (quoting Tigue v. Commercial Life Ins. Co., 631 N.Y.S.2d 974, 975 (4th Dep't 1995)).  In so doing, we must "give full meaning and effect to all of its provisions." Am. Express, 562 N.Y.S.2d at 614; see also Gonzalez v. Norrito, 682 N.Y.S.2d 100, 101 (2d Dep't 1998).  "Where the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law and the case is ripe for summary judgment." Am. Express, 562 N.Y.S.2d at 614.

The Agreement provides the terms and conditions that govern business dealings between AT&T and KATEL.  Of the two provisions that bear on the present dispute, one gives broad rights that the other (in part) takes away, so that they must be read together: Paragraph 7 provides that the traffic will be routed on the AT&T-KATEL direct circuits (and may be

10

routed indirectly via Russia or Turkey "only when direct circuits are not capable of carrying the offered traffic"); but Paragraph 19 says that "either party [may] enter into similar service agreements with other parties."  Thus Paragraph 7 can grant no right that requires exclusive dealing.  To begin with, nothing in Paragraph 7 requires the parties to do business with one another at all: It is not a requirements contract, and it imposes no minimum volume. Paragraph 7 fixes a preference for direct transmission of telecommunications that go from AT&T and terminate with KATEL, but (particularly in light of Paragraph 19) that does not bar AT&T from sending calls toward Kyrgyzstan other than via KATEL.  Rather, as the district court correctly concluded, paragraph 7 describes only how the telecommunications services covered by the Agreement will be provided and does not concern whether telecommunications services so provided are covered by the Agreement.

KATEL argues that, under Paragraph 7, its direct circuits are the "primary" means for sending AT&T-originated calls into Kyrgyzstan, and AT&T may route traffic indirectly only if these direct circuits fail.  The Agreement itself does not use the word "primary."  But, more fundamentally,

11

such an understanding cannot be squared with the right of the parties (under Paragraph 19) "to enter into similar service agreements with other parties."  Two "similar service agreements" could not compatibly require two Kyrgyzstani companies to provide "primary" termination services to the same place.[3]  KATEL's interpretation of the Agreement therefore leads to an illogical result, and we decline to endorse it.  Cf. Long Island Lighting Co. v. Allianz Underwriters Ins. Co., 749 N.Y.S.2d 488, 495 (1st Dep't 2002) (avoiding a contractual interpretation that would lead to an illogical result); PNC Capital Recovery v. Mech. Parking Sys, Inc., 726 N.Y.S.2d 394, 397 (1st Dep't 2001) (same).

Accordingly, we agree with the district court that the Agreement imposed no obligation on AT&T to send traffic to KATEL.  It follows that AT&T was not in breach by electing to send traffic to Kyrgyzstan by other carriers and other means.

---

[3] See The Random House Dictionary of the English Language 1142 (Unabridged ed. 1971) (defining "primary" as "first" or "highest in rank or importance").

**III**

KATEL next argues that, even if AT&T is not liable for breach of contract, AT&T must nonetheless pay KATEL for all AT&T-originated calls that terminated in Krygyzstan.

On April 26, 2006, AT&T, KATEL, and KT entered into a stipulation (which took the form of a court order) providing that, for the period January 1997 through May 2002, AT&T owed $1,120,199.04 for termination services in Kyrgyzstan. AT&T lodged that sum with the district court, to be distributed according to the result of the ensuing KATEL-KT arbitration (which KATEL won in full). But though the payee was in doubt, the sum was rendered certain by the stipulation.

"[A] stipulation is generally binding on parties that have legal capacity to negotiate, do in fact freely negotiate their agreement and either reduce their stipulation to a properly subscribed writing or enter the stipulation orally on the record in open court." McCoy v. Feinman, 99 N.Y.2d 295, 302 (N.Y. 2002); see also Calvin Klein Ltd. v. Trylon Trucking Corp., 892 F.2d 191, 194 (2d Cir. 1989). "[C]ourts should not disturb a valid stipulation absent a showing of good cause such as fraud,

collusion, mistake or duress[,] or unless the agreement is unconscionable or contrary to public policy[,] or unless it suggests an ambiguity indicating that the words did not fully and accurately represent the parties' agreement." McCoy, 99 N.Y.2d at 302 (internal citations omitted). KATEL has offered no reason why it should not be bound by its stipulation. Accordingly, we hold that through May 2002, KATEL has no entitlement to additional fees from AT&T.

Nor is KATEL owed money for events that occurred after May 2002. At that time, AT&T stopped sending international calls directly or indirectly to any carrier in Kyrgyzstan; instead, it exclusively used the refile method of traffic termination. Under refile, AT&T's payment obligation was to a third-party carrier, and that third-party carrier was in turn responsible for paying KATEL, KT, or any other Kyrgyzstani carrier. AT&T had no payment obligation to KATEL (or KT).

KATEL suggests that industry custom and practice entitle it to payment. Under New York law, evidence of custom or practice may be admissible only "if the agreement is found to be ambiguous." Milonas v. Pub. Employment Relations Bd., 648 N.Y.S.2d 779, 785 (3d Dep't 1996); see

14

also <u>W. Union Tel. Co. v. Am. Commc'ns Ass'n, C.I.O.</u>, 299 N.Y. 177, 184 (1949); <u>Polyfusion Elecs., Inc. v. AirSep Corp.</u>, 816 N.Y.S.2d 783, 785 (4th Dep't 2006). Moreover, such evidence "should not be admitted to *create* an ambiguity in an otherwise clear and unambiguous agreement." <u>Milonas</u>, 648 N.Y.S.2d at 785. Because the Agreement is unambiguous, there is no occasion to consider evidence of custom or practice.

**IV**

KATEL contends that AT&T tortiously interfered with its (KATEL's) business relationship with KT. New York law governs our analysis. <u>See</u> <u>Konikoff</u>, 234 F.3d at 98. "In order to prevail on a cause of action for tortious interference with contractual relations, a plaintiff must establish the existence of a valid contract between plaintiff and a third party, the defendant's intentional and unjustified procurement of the third party's breach of the contract, the actual breach of the contract[,] and the resulting damages." <u>Jim Ball Chrysler LLC v. Marong Chrysler-Plymouth, Inc.</u>, 796 N.Y.S.2d 804, 805 (4th Dep't 2005).

15

In the district court and again on appeal, KATEL relies principally on paragraph 39 of Jacoby's declaration to substantiate its claim for tortious interference. That paragraph states in full:

> [T]hroughout the entire history of [the Agreement,] and at least since 1995, AT&T has taken every opportunity to drive a wedge between KATEL and [KT]. By negotiating behind KATEL's back with [KT]--a KATEL Joint Venture participant --AT&T has seriously damaged KATEL's relationship with [KT]. Indeed, KATEL's shareholders, including the Ministry, were forced to vote [KT] out of the joint venture in 1998. By poisoning this relationship with [KT], AT&T created a hostile atmosphere in which KATEL must now conduct business in the Kyrgyz Republic. It has also created tensions between KATEL and [KT]. This relationship is critical to KATEL's well being, as the parties['] networks are interfaced. KATEL's subscribers must have access to [KT]'s subscribers and vice versa. AT&T's actions have also, on more than one occasion, prompted [KT] either to deprive KATEL of access to its equipment, or to extract payments from KATEL of AT&T's debt (which only resulted in a further dispute with [KT] over the scope of the guarantee in the form of the assignment that has also been the subject of litigation before this Court). In sum, AT&T['s] actions in dealing with [KT] have resulted in [KT], KATEL's substantial Kyrgyz participant, severing all partnership ties with KATEL.

As the district court concluded, this evidence is too conclusory to withstand summary judgment. There is nothing that points to any instance, manner, or method of interference; nor is there a reference to a document,

16

conversation, or communication that would allow an inference of tortious interference. "A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory. . . ." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008).

**V**

KATEL argues that the International Telecommunications Regulations ("ITRs") afford it a private right of action against AT&T. This is a matter of first impression for this Court.

The ITRs have treaty status and were promulgated by the International Telecommunications Union (the "Union"). S. Treaty Doc. 102-13 (Melbourne 1988). See Cable & Wireless P.L.C. v. FCC, 166 F.3d 1224, 1230 (D.C. Cir. 1999). The Union is a specialized United Nations agency responsible for international telecommunications issues. See ITU TELECOM FAQs, available at http://www.itu.int/ITUTELECOM/faq.html. There are currently 191 member states, including the United States and Kyrgyzstan. Id. (follow hyperlink "191 Member States").

17

The United States and Kyrgyzstan both adopted the ITRs. See International Telecommunications Regulations (ITRs), available at http://www.itu.int/ITU-T/itr/ (follow hyperlink "Status of ratification of ITRs"). The ITRs "establish general principles which relate to the provision and operation of international telecommunication services offered to the public as well as to the underlying international telecommunication transport means used to provide such services." See Int'l Telecomms. Regulations, Art. 1, § 1.1(a).

There is a presumption that "treaties do not create privately enforceable rights in the absence of express language to the contrary." Mora v. New York, 524 F.3d 183, 201 (2d Cir. 2008) (internal quotation marks omitted); see also id. at 202 n.25 (citing cases from other circuits); id. at 201-02 ("Our precedents recognize a presumption against inferring individual rights from treaties."). If a State that is party to a treaty wishes to create a private right of action, "we would ordinarily expect expression of these obligations to be unambiguous." Id. at 202. "Even when treaties are self-executing . . . the background presumption is that international agreements, even those directly

18

benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts." Id. at 200 (quoting Medellin v. Texas, 552 U.S. 491, 506 n.3 (2008)).

No wording in the ITRs creates a private right of action, and KATEL cites none. Instead, KATEL argues that, because the treaty is binding on the United States (as a member state and signatory to the ITRs), it provides KATEL a private right of action ipso facto. However, membership in the Union is limited to sovereign entities (not private corporations such as KATEL). See Union Const., Art. 2. Furthermore, the Union's Constitution provides for the "Settlement of Disputes" only by "Member States," not by private entities in those member states. Id. at Art. 56. Whether a Member State has rights under the treaty, or is bound by it, says nothing about whether a private party in that Member State has a private right of action. See Medellin, 552 U.S. at 506 n.3.

## VI

KATEL moved to reopen discovery for the purpose of designating Jacoby as an expert witness who would testify

that industry custom and practice required AT&T to pay a fee to KATEL for calls terminating in Kyrgyzstan, regardless of whether AT&T had any contractual obligation to make those payments.  The district court denied the motion, and our review is for abuse of discretion.  See In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 58 (2d Cir. 1998).

In the district court, KATEL argued that discovery should be reopened because "expert disclosure in connection with Mr. Jacoby's proposed testimony [had] not [previously] appear[ed] necessary."  See Memorandum of Law in Support of KATEL's Motion to Reopen Discovery at 4.  On appeal, however, KATEL abandons that argument and raises for the first time the argument that its failure to designate Jacoby was a result of having to attend to the KATEL-KT arbitration, which lasted years and which was allegedly provoked as part of AT&T's scheme to disrupt the business relations between the two Kyrgyzstani phone companies.

An argument raised for the first time on appeal is typically forfeited.  See In re Nortel Networks Corp. Sec. Litig., 539 F.3d 129, 132 (2d Cir. 2008).  True, this rule is prudential, not jurisdictional, and we may consider a forfeited argument if there is a risk that "manifest

20

injustice" would otherwise result.  Id. at 133.  But there is no such risk here.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of the district court.